Good morning, your honors, and may it please the court, Harry Williams for appellant Oliver Pearson. Mr. Pearson did not receive a fair trial. As your honors know, this was essentially a credibility contest. There were only two witnesses to the entire PAT search at issue here. The defendant, Officer Pasha, and my client Oliver Pearson. So it was a he said, he said, and credibility determined the outcome of the case. Officer Pasha, as well as three other witnesses that he called, all testified to the robotic perfection with which Officer Pasha conducted his PAT searches. The testimony was that he was a quote, top-rate officer, that he always did things by the book, that he never made a mistake and never deviated from the correct procedures when doing a PAT search. But Mr. Pearson was not allowed to probe that testimony, to probe the credibility of that testimony on cross-examination. Although there was evidence that there were complaints by other prisoners about the PAT searches, he was not allowed to get into cross-examination on those issues. In contrast, Officer Pasha was allowed to bring up all sorts of alleged bad acts by Mr. Pearson to impeach his credibility. That stark contrast made the trial unfair. The district court's evidentiary rulings were an abuse of discretion that tainted the jury verdict and therefore Mr. Pearson deserves a new trial. Now, our brief goes through a number of instances where the district court cut off cross-examination on other specific instances of improper PAT searches. For instance, at ER 316, Mr. Pearson was not allowed to cross-examine the defendant about other prisoners' specific complaints of improper PAT searches. And the objection in that instance was irrelevance. That can't be right. It certainly is relevant whether other individuals were subject to improper PAT searches. The same irrelevance objection was sustained for several other witnesses. At ER 255, Officer Garcia, whose only purpose for being called at trial was to bolster Officer Pasha by testifying at length about how good the training was that Officer Pasha received and what a good officer Pasha received. When Officer Garcia at 255 was asked about specific instances of other improper PAT searches, the district court instructed the witness, don't answer the question. They instructed Mr. Pearson, move on, different question. Ultimately, the jury understood that there were complaints about improper searches, right? That got in. There was. Testimony about that. Yes, Your Honor. And it got in in the worst possible way and in the most biased way towards Mr. Pearson in that he was allowed to say, well, other prisoners complain. The answer, yes. He was not allowed to probe into that. And the problem with that yes answer was that all of these witnesses testified, yes, there are other complaints, but they consist merely of griping or homosexual slurs. What we don't have is a record of cross-examination on specific instances where prisoners have complained about improper PAT searches that might well have been similar. If we look at the record at ER 406, this is Officer Lamb who did the Prison Rape Elimination Act investigation and also testified at trial. So ER 406, Officer Lamb says, well, Mr. Pearson's complaints sound an awful lot like the some other complaints that I've heard from prisoners. But rather than thinking, well, therefore, I should investigate this further, he decided, well, that must mean that Mr. Pearson just heard other prisoners saying that and didn't investigate further and then testified at trial that what Mr. Pearson was doing was simply echoing what other prisoners had said. And so we know from the record that there were other prisoners who complained about improper PAT searches and did so, apparently, much more, and complained in a way that was much more substantive than calling the officer names. But Mr. Pearson wasn't allowed to probe that. In a credibility contest, that disarmed him and virtually ensured that Officer Pasha would be the victor at the... Does that invite going to trial on multiple episodes? Because what matters in the end is not whether there was a complaint or the denial of officers as to whether there's improper touching going on, but what happened in each particular episode. I can understand the judge not being eager to invite a trial, not of what happened in this episode, but what happened this day and this day and this day and this day with a bunch of other people. How is that relevant? Well, I agree that this could have been a much shorter trial, but the defendant himself opened up the...opened the door to all this testimony. He's saying, I always do it right? Not just the officer saying he always did it right, but bringing in three other officers to say, well, I always do it right. And if you say you always do it right, then you are, I think, opening the door to other specific instances. If he'd have said that one time, maybe that's not error to allow more probing on specific instances, but when you say it repeatedly, when you say, when you call a witness, as the defendant did here, to testify that Montana has a, quote, zero-tolerance policy towards sexual assault by staff and that they are well trained on sexual assault issues, that leaves the impression that there is no sexual assault at Montana prisons. He has to...the person... Well, but that sounds like there was sexual assault in the past, and now there's a zero-tolerance sexual assault policy. And so the impression left to the jurors here with all of this bolstering testimony, and it goes on for pages and pages and pages as we discuss in the briefing, is that, you know, this officer never made any mistakes. And if that's true, then it's strange that we also have things in the record like ER-406, the LAM report, ER-440 complaints about Officer Pasha. So we know somewhere out there that there are these complaints, but we weren't able to probe. You know, Mr. Pearson was not able to probe those on was an abuse of discretion here. You know, this is, at base, really much like a simple assault case. I mean, it's different for any number of reasons because it's constitutionalized in prisoners. But if this were an assault case and the person, the defendant in the assault case said, you know, I'm a peaceable person. I never get in fights. And we had lots of evidence that he'd gotten in other fights, but you couldn't impeach that testimony with other acts, you know. Then our jury system would be a lot less effective. You have to be able to have, to impeach witnesses with their acts that specifically contradict their testimony. So this just doesn't just open the door generally. It opens the door specifically to impeach his testimony that he never made mistakes when he did cat searches. Well, what evidence did your client have to prove, in fact, really distinguishing between factual proof and evidence of complaints? Because complaints aren't self-fulfilling. The fact that there have been complaints doesn't mean there's actually been misconduct or improper touching or whatever. Your client's effort to cross-examine, how did it reach the question or how did it propose to present evidence of actual misconduct in other episodes? Well, there are two answers to that. First, you know, he should have just been allowed to ask those questions. If, in fact, under oath, Officer Pasha and the he would have been forced to leave that answer as it was. The second problem with how this trial was run is that Mr. Pearson had subpoenaed the records, the written records of other prisoners' grievances, and that subpoena was denied because it was considered untimely. I think that that was also an abuse of discretion because given Mr. Pearson's pro se status, he should have been allowed to subpoena these people months before trial to try to get those records. And, again... Was that, okay, so let's just kind of go procedurally, but was that appealed, the subpoena issue? What, is that subject to appeal? Is it part of this appeal? I think it is because he objected several times, and I don't have those record sites, but in the record here, he asked for the subpoena, then it was denied, and he appealed that to the district court, and... But the fact is, is it appealed to this court? Yeah, I think it's preserved for error, and we do talk about it in our brief, that he should have been allowed to subpoena those records because without those records, you know, then it is just, you know, the cross-examination is... Even with those records, those records don't prove misconduct, they prove complaints by others about misconduct. Exactly, but he doesn't have to prove misconduct because this is a credibility contest, and so if you have the defendant standing there saying, I never do anything wrong, and then you have a whole string of people saying, he does something wrong, that gives the jury pause. That gives... He says, we have a lot of complaints, and I'll tell you why we have these complaints, because of the nature of this kind of search, and why we have it, and why the WAC, or whatever, lets us do this. So he testifies to all that, so going back to Judge Clifton's question, let's say you got the complaints, what would you be able to prove or cross-examine with those that would really be relevant? Because if there were five, or ten, or fifty, or a hundred other complaints that said, you know, Officer Pasha squeezed my genitals, that brings out a lot more credibility, and makes Judge Clifton's story seem a lot more credible. Without that kind of evidence, it just looked like Mr. Pearson was exactly what the defendant tried to portray him as, as just a whiner. And he wasn't just a whiner, he was someone who, who, there were no other complaints in the record that he'd complained about other officers' searches. He complained about Officer Pasha. And what we don't know, because cross-examination was cut off, and what we don't know, because he didn't have the full evidentiary record, is whether Mr. Pearson's complaints were substantially the same as a number of other inmates. And, but we do have, at ER 406, Officer Lamb saying, yeah, it sounds a lot like other prisoners' complaints. I'd like to reserve a couple minutes. I reserve the remaining time. Thank you. May it please the Court, I'm Ira Aiken, appearing on behalf of Defendant Pasha. Your Honors, the issue in the case is obviously whether Mr. Pearson got a fair trial. We submit that he did get a fair trial. He had his day in court. I think this court would agree that it's all fairly unusual for cases of this nature to make it to a full-blown jury trial. This case, Judge Malloy actually overruled the magistrate's initial recommendation that the case be dismissed. The motions for summary judgment were dismissed. And Judge Malloy, the same judge who overruled the magistrate, presided over this case. And Mr. Pearson got a fair trial. The standard of this court, as set forth in the Harper case, which was cited in the appellant's brief, is that this court won't lightly cast aside the solemnity of a jury's verdict. And where there is a verdict in favor of a party, that party is entitled to have the evidence viewed in the light most favorable to it on appeal, resolving conflicts, and giving benefit of reasonable inferences. In this case, the fact that Mr. Pearson is arguing that he was not allowed to properly cross-examine witnesses about other complaints concerning pad searches. First of all, that's just not true. Two witnesses for Mr. Pearson, that would be Mr. Kelly, he testified that inmates do complain about pad searches. Mr. Pearson testified about other prisoner complaints of pad searches. And that was upon questioning by Judge Malloy, actually helping out Mr. Pearson. And then Officer Lamb testified about other inmate complaints about pad searches. Officer Captain Zuber testified about other inmate complaints about pad searches. And the most critical witness, Officer Pasha, testified that, yes, he had been subjected to other complaints about his pad searches by other inmates. So he did get to cross-examine on that very issue. Well, he didn't. He was kind of cross-examining in a vacuum, though, because he doesn't have the records. And you would agree it would be a different kind of cross-examination if he actually had stacked up 25 complaints on the same subject. That is a great point, Your Honor, and I was going to make that point because complaints are not recorded. At the prison, complaints made by inmates are not recorded on paper. They are not kept track of. There are so many complaints by so many inmates. They're kept track of if they file an administrative proceeding. If they file a grievance. Yeah. And a grievance is different from a complaint, Your Honor. Okay, so was he permitted to get all the grievances against him? He never asked for all the grievances that I'm aware of. And that's a, you know, the terminology in this case, I think, has been used somewhat loosely because every officer at the prison gets complaints. Sure. And if you work there long enough. He might have been, you know, using the term loosely, whether I understand there's complaints. And everybody said there's complaints. Was he denied the opportunity to get copies of the grievances? He never asked for the grievances. He asked for complaints. Yes. But then they said you're too late to ask. So then what happened? Well, the fact is he never asked for copies of the grievances in discovery. And even then, Your Honor, I would, you know, I would have asked, okay, during what time frame? For which officers? All officers or just this officer? I mean, that's the kind of analysis you start getting into when you start allowing this kind of evidence in a trial. And so the very first problem that we're running into in this trial is the word complaints. Because inmates complain about all kinds of things all the time. And unless there's an incident, an altercation, or a formal grievance, there's no tracking of those complaints. They're in one ear, they're out the other, basically. If a grievance is filed, there's a whole formal procedure, starting with the informal grievance, which is addressed by the housing officer, and then the formal grievance process that follows, which is more or less an appeal of that grievance. And it goes to the grievance committee first, and they investigate it. And then it goes to the prison administration for review. And then ultimately it goes to the director's office for review. That's a whole different category of things than complaints. So he didn't get either incident reports or the grievances, and that issue wasn't actually challenged below, is that what you're saying? That's what I'm saying, Your Honor. And moving on, I mean, our bottom line position on that whole issue is that he was allowed to cross-examine on that issue. He did, there were, I think, maybe five objections that were lodged on those kinds of questions. One was on Mr. Shack. Again, it was the word complaints. At that point, there was no foundation, really, that had been laid for that question. The next witness, Mr. Kelly, he testified about other inmate complaints. Mr. Pearson testified about other inmate complaints. Officer Garcia, there was an objection made when he was asked about other officer complaints. He's not a field officer, he's a training officer. I don't believe that there was an adequate foundation for that question from him. But Lieutenant Lamb was asked the question, and when Lieutenant Lamb said, do you want me to speculate on why, if there was ever a time to object on the grounds of speculation, I think that was it. And then, you know, Captain Zuber testified about the other complaints and why. And then, lastly, Officer Pasha testified about the complaints he gets and why. And at one point, Mr. Pearson, you know, said something like, well, it's really interesting that you get a lot of complaints. And I think the objection was relevant. And I think it is really irrelevant to say it's really interesting that you get a lot of complaints. The more appropriate objection would have been argumentative, but in any event, it was an improper question. And the bottom line is he did get to ask those questions. Another ground for error, Your Honor, that Mr. Pearson has alleged is that he was unable to get his grievances into evidence. And Officer Pasha had stipulated to the admission of those grievances in the pretrial order. Those were, in fact, attached to Mr. Pearson's complaint in this case. And they're in the excerpts of record. They were available to the court and to Mr. Pearson all during trial. And throughout these proceedings, there were three, is what we're talking about, three documents. And but what happened was we went through the plaintiff's case in chief, and that was three witnesses. And at the end of that case in chief, you know, Judge Malloy did help him through his questioning. And Judge Malloy said, this is your chance to get in everything that you want to get in. And he identified, Mr. Pearson identified a DOC policy that he said he wanted to get in. And so that exhibit was ultimately introduced and admitted. But then we proceeded on from there, and we were, the plaintiff had rested. All of the defense non-party witnesses had been released from their subpoenas. It was the end of the day. We had settled jury instructions. I'm literally packing my briefcase to walk out the door. And Mr. Pearson mentioned something about putting his grievances into evidence. And Judge Malloy, recognizing that that's highly out of order, said, how are you going to do that? And there was an exchange at that point. And the judge looked at me and said something about, you know, do you object? And I said, well, yes, I object, Your Honor. And because if he had introduced them in his case in chief, I would have had an opportunity, I would have cross-examined him more on those grievances. Now, you can argue, okay, well, you could have put Pearson back on the stand. Well, that's the last thing I want to do, is give the jury an opportunity to hear Mr. Pearson again. So you can call that a strategic decision if you want. But secondly, I would have also followed up with more questions with Lieutenant Lamb. About those grievances. Because the grievances themselves were not consistent. They were inconsistent. And because they changed. Each one of them changed. Suppose he had made a motion to admit the grievances at the same time he was closing his case in chief. Would that have been any different? I understand that's not what happened. But wouldn't you have already watched your opportunity to examine him differently? Would it already have come and gone? It's not unusual for exhibits to be admitted kind of in a cleanup process, and particularly with a pro se party. So would it really have made any difference? Well, you're asking me to speculate, Your Honor, on what I would have done. We don't have the rules of evidence here, so I'm allowed to do that. I don't know the answer to that question. In retrospect, I wish now I had not objected. Because I do not think that it would have changed the question. That's pretty true up here. We usually sort of you get more than you wanted sometimes. Let me ask you on a kind of factual basis. Was there anything in the grievances that in substance hadn't already come in?  The answer was that these grievances were in Mr. Pearson's handwriting. He had an opportunity to testify verbatim from those grievances if he wanted to. And in fact, there was nothing contained in the grievances that hadn't already gotten into evidence verbally. So these documents would have just been marked as exhibits. They would have gone to the jury, and they'd have been there for what they were worth for the jury to consider. I really don't think that the outcome of the trial would have been changed at all. I would like to point out another misconception that I think that the plaintiff and the appellant have in this case, which is at least five times during their brief, during Pearson's brief, he says that these grievances, he refers to prior grievances made against Officer Pacha, and how these grievances would have shown the jury a motive on Officer Pacha's part to get even, so to speak, with Mr. Pearson. There were never any prior grievances filed by Mr. Pearson against Officer Pacha. I think we know that from the record. Okay. So again, we, the argument, our argument, Your Honors, is that there was no prejudice. And this case is distinguishable by the way from the Loinaz case, which is heavily relied upon by Mr. Pearson. In Loinaz, that was a defense motion to call a critical expert witness live during the plaintiff's case in chief. And the court refused to allow that and forced the defense into reading a deposition into the record. A couple of very distinguishing things about that case. Number one, we're talking about a live witness giving testimony under oath in front of the jury, where the jury's allowed to observe their demeanor and character, or demeanor and personality on the witness stand. And in this case, you're dealing with cold pieces of paper. And the other distinction is that it is somewhat easier, I think, for the plaintiff to change up their case, to react to things, than it is for the defense to change up things in their case. In the sense, well, so I believe Loinaz is very distinguishable because in Loinaz, the court's failure to allow the defense to call their one critical witness, the most critical witness, out of order, truly was prejudicial to the defense in that case. I don't believe Judge Molloy's decision in this case was prejudicial to Mr. Pearson, and we were dealing with pieces of paper to which testimony had already been given. I want to address for a minute Mr. Pearson's complaint about his garb, so to speak. And, you know, if I had been Mr. Pearson's counsel at trial, I don't know that I would have had him wearing a suit. I think that there, I think Americans, to a certain extent, love an underdog. And I kind of love it when I'm in trial, and I'm one lawyer sitting at a table, and there's six sitting at the other table. And in this case, you had a prison inmate in an orange jumpsuit, and you had two attorneys dressed in suits over at this table. And I think to a certain extent, you can argue that that would make the jury actually more sympathetic to his plight. And it would certainly show that he's under state control and restraint. And I think it kind of accentuates the fact that they needed to look at his testimony. So you should have asked for a continuance to make sure he was able to change and didn't. Well, Your Honor, Judge Molloy didn't consult me a lot on that. And I would not have objected if the, you know, if the clothes had been there. I wouldn't have done me any good anyway, because Judge Molloy made clear he would have granted the motion. We don't believe that Mr. Pearson, we believe Mr. Pearson got a fair trial. And the decision of, decisions of the lower court should be affirmed. And the jury's verdict should be affirmed, Your Honor. Thank you. I have four quick points I'd like to make on rebuttal. Starting off with this issue of the complaints and would they have mattered, I think they would have mattered. There was an argument in close that Mr. Pearson never complained about pain. But those grievances, which are ER 468, 469, and 470, describe pain. And so that would have contradicted, you know, this argument that he didn't actually suffer. Second, as to whether he actually asked for grievances, if you look at the record at ER 374, that's his subpoena request of September 7th, 2011. That spells out what he wants. And he wants all incident reports. And since this is a pro se proceeding, I would think that that would include grievances or complaints or whatever the proper terminology is. About Officer Pasha from 2007 to 2009 and in 2011. So it's a limited period, it's a limited thing. It would not have been a great burden. As to this question, you know, I would draw the court's attention to pages ER 228 through 232. Where the defense counsel says that Mr. Pearson opened the door to other bad acts evidence. And first of all, I think that's just incorrect. He asked a very narrow question, have I been written up for manipulation? And Counselor Shack said, not that I'm aware of. Defense counsel used that to get in a lot of other evidence of other bad acts generally, of staff manipulation, of being sent to the hole. That's in stark contrast to what Mr. Pearson got when he tried to talk about other bad acts. He was not allowed to ask those questions. His cross-examination was cut off. Again, I think that it's an unfair trial. And just as a final point, I'll just make this 404B point that appellants make in their brief that somehow this evidence shouldn't have come in because it was 404B evidence. That's plainly wrong. Impeachment by contradiction is well-established. You know, one case that you can consider is U.S. v. Antoniakis, 255 F3rd at 724. Talks about how 404B does not prevent impeachment by contradiction. You know, in short, given the number of things that were against Mr. Pearson, and given that he was not allowed to cross-examine witnesses on specific acts of other improper pat searches, the trial was unfair. It was a credibility contest in which Mr. Pearson was disarmed. He should get another shot at trial. Thank you. Thank you, Your Honors. The case just argued is submitted. Also, Mr. Williams, we thank you on behalf of the Court for your participation in the pro bono program. It's very helpful to the Court to have all these arguments laid out so nicely in a brief. And thank you also, Mr. Ekin, for coming and for your argument. The case is submitted.
judges: Hawkins, McKeown, Clifton